WO
SKC

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brigham Burton and Carly Burton (husband and wife), <br><br> Plaintiffs, <br><br> v. <br><br> Arizona Department of Public Safety, et al., <br><br> Defendants. | No. CV 20-00920-PHX-JAT (JZB) <br><br> **ORDER** |

Plaintiffs Brigham (also known as Kent) Burton and Carly Burton, who are represented by counsel, have filed this civil rights action pursuant to 42 U.S.C. § 1983. Before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. 26).

The Court will deny the Motion.

## I.    First Amended Complaint

In their First Amended Complaint, Plaintiffs sue Defendants the State of Arizona and Arizona Department of Public Safety (AZDPS) Officer Kevin Watt based on Defendants' alleged violations of Plaintiffs' constitutional rights arising from Plaintiffs' May 16, 2019 arrests without probable cause on charges of Aggravated taking the identity of another or entity, Forgery, Fraudulent schemes and artifices, Fraudulent schemes and practices/willful concealment, Perjury by inconsistent statements, Theft, and Unlawful use of food stamps. (Doc. 11 ¶ 39.) Plaintiffs allege the following facts:

1    On or about May 16, 2019, Plaintiff Brigham Burton ("Brigham") was on a bike ride with two of his four children when AZDPS officers stopped Brigham and his children, and Defendant Watt told Brigham that, if he cooperated, the officers would not "go swat" on his home and frighten his wife Carly and the two other children who were still at home. (*Id*. ¶ 10.) Brigham fully cooperated with the officers, unaware that Defendant Watt had lied to him about not going to his home and that the officers had already entered Plaintiffs' residence and arrested Plaintiff Carly Burton ("Carly") in the home in front of the other two children. (*Id.* ¶ 11.) Defendants arrested both Plaintiffs without probable cause or warrants for their arrests. (*Id.* ¶¶ 12−13.)

During Plaintiffs' arrests, the four minor children cried, and the officers refused to provide any information to Plaintiffs as to where the children would be taken. (*Id.* ¶ 15.) Defendant Watt would not allow Plaintiffs to call a family member to come watch the children and instead filed a negligence claim against Plaintiffs with the Arizona Department of Child Services (AZDCS), prompting a child-abuse/child-neglect investigation against Plaintiffs. (*Id.* ¶ 16.) These actions led to the removal of Plaintiffs' legal and physical custody of their children for 6 weeks following the arrests. (*Id.* ¶ 17.)

During Brigham's arrest, Defendant Watt pressed metal cuffs into Brigham's wrists behind his back until his wrists were bleeding and only made them tighter when Brigham asked if he could please loosen them because they were causing severe pain. (*Id.* ¶ 18.) Defendant Watt left the handcuffs on Plaintiff for several hours, even at the police holding facility, where Brigham was held in a secure jail cell. (*Id.* ¶ 19.)

Plaintiffs' parents came to Plaintiffs' home to try to take custody of the children, and, while they were there, they and the children witnessed Defendant Watt remove a "secured-key" case containing a gun from a high shelf and open it, then leave it open on the floor without securing the gun, putting the children at undue risk of possible harm or death. (*Id.* ¶ 20.)

Plaintiffs were not read their *Miranda* rights until several hours after their arrests, after they had already been subjected to several hours of intimidation, threats, and

interrogation. (*Id.* ¶ 21.) They were also denied the right to call their attorney at the time of their arrests and were only given a phone book and jail phone several hours later. (*Id.* ¶ 22.)

Upon her arrival at the holding facility, Carly told AZDPS employees that she wanted to exercise her right to an attorney, and Defendant Watt put her in a small holding cell for several hours. (*Id.* ¶ 23.) When Carly asked when she could call an attorney, Defendant Watt told her she could not call an attorney because that was "not how this works." (*Id.* ¶ 24.) He also told her she was going to go to jail, her trial was the next day, and she was going to lose custody of her children and possession of her home if she did not cooperate. (*Id.* ¶ 25.) After several hours of threats and intimidation, Carly answered all of Defendant Watt's questions even though she had asked for an attorney. (*Id.* ¶ 26.)

The jail cells where Plaintiffs were held were filled with gnats, flies, and roaches, and there was no separation of alleged criminals based on their charges, so that Brigham shared a cell with 2 men who had killed another and were being released after serving multi-year sentences. (*Id.* ¶¶ 27−28.)

After Plaintiffs had spent more than 30 hours in jail, the Maricopa County Superior Court entered a final order finding "no probable cause," and Plaintiffs were released from custody. (*Id.* ¶¶ 30−31.) Judge Carson found that the prosecution's claims against Plaintiffs were not valid whatsoever, and she rebuked Defendant Watt and the prosecution for inappropriate handling of the arrest and questionable jurisdiction. (*Id.* ¶ 32.)

On June 24, 2019, about two weeks after Judge Carson's "no probable cause" ruling, the AZDPS published a press release on the internet, which contained false and defamatory statements about Plaintiffs, leading to Carly's termination from her career with the AZDCS. (*Id.* ¶ 34−35.) Brigham has also been denied business opportunities, loans, and investment capital that might otherwise have been secured but for the defamatory online post by Defendants. (*Id.* ¶ 46.)

Defendant Watt removed personal property, including tax and business records from Plaintiffs' home, and when Plaintiffs asked for the return of these records to properly

complete their tax returns, he said no. (*Id.* ¶¶ 36−37.)  Defendant Watt also took personal diaries and journals, cell phones, computers, laptops, books, cash, and other property belonging to Plaintiffs and has yet to return them, despite multiple requests.  (*Id.* ¶ 38.)

Plaintiffs assert the following claims: in Count One, Fourth and Fourteenth Amendment claims against the State and Defendant Watt based on Plaintiffs' false arrests; in Count Two, Intentional Infliction of Emotional Distress against the State and Defendant Watt; in Count Three, Fourth and Fourteenth Amendment claims against Defendant Watt based on false arrest; in Count Four, a municipal liability claim against the State based on alleged unconstitutional policies and practices and failure to train; in Count Five, a defamation claim against the State based on the AZDPS online publication; in Count Six, a libel claim against the State based on the AZDPS online publication; in Count Seven, a false light – invasion of privacy claim against the State based on the AZDPS online publication; in Count Eight, a Fourth Amendment claim against Defendant Watt based on the seizure of Plaintiffs' personal property; and in Count Nine, a Fifth Amendment claim against Defendant Watt based on unlawful interrogation and denial of the right to counsel.

Plaintiffs seek compensatory and punitive damages, costs, and attorneys' fees.  In their Motion for Preliminary Injunction, they seek the removal of the allegedly defamatory press release about their arrests on the AZDPS website.

## II.  Injunctive Relief Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").  A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are

'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this serious questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

Regardless of which standard applies, the movant "has the burden of proof on each element of the test." *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000). Further, there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction, which should not be granted "unless the facts and law clearly favor the plaintiff." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986) (citation omitted).

"The urgency of obtaining a preliminary injunction necessitates a prompt determination" and makes it difficult for a party to procure supporting evidence in a form that would be admissible at trial. *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). As a result, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In its determination on a motion for a preliminary injunction, "a court may properly consider evidence that would otherwise be inadmissible at trial." *Cherokee Inc. v. Wilson Sporting Goods Co.*, No. CV 15-04023 BRO (Ex), 2015 WL 3930041, at *3 (C.D. Cal. June 25, 2015); *see Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (district court did not abuse its discretion by considering " unverified client complaints" and the plaintiff' s counsel's interested declaration when it granted a preliminary injunction); *Flynt Distrib. Co.*, 734 F.2d at 1394 (the district court has discretion to rely on hearsay statements when deciding whether to issue a preliminary injunction). A court may also consider evidence or developments that

postdate the pleadings. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). Indeed, it is a defendant's current conduct that determines whether injunctive relief is warranted. *Id.* at 845–46.

When evaluating the merits of a preliminary injunction motion, a court's factual findings and legal conclusions are not binding at trial on the merits. *Univ. of Tex.*, 451 U.S. at 395.

### III. Motion for Injunctive Relief

In their Motion for Preliminary Injunction, Plaintiffs seek a Court Order, requiring Defendants to remove their publication about Plaintiffs from the AZDPS website during the pendency of this action. (Doc. 26.)

The publication is a June 24, 2019 entry on the AZDPS website under the tab "News," sub-tab "AZDPS News," currently 6 pages in, behind dozens of more recent entries, entitled "Chandler Couple Facing Numerous Charges after Defrauding Several Victims and the State of Arizona." (Doc. 26-2, Ex B, at 2.)[1] It contains the following information:

> Chandler, Arizona — On Thursday, May 16, 2019, Arizona Department of Public Safety (AZDPS) detectives arrested and booked 42-year-old Kent Burton and his wife, 36-year-old Carly Burton on charges of:
>
> • Aggravated taking the identity of another or entity
> • Forgery
> • Fraudulent schemes and artifices
> • Fraudulent schemes and practices/willful concealment
> • Perjury by inconsistent statements
> • Theft
> • Unlawful use of food stamps
>
> Throughout the investigation, detectives discovered Kent and Carly Burton falsified the victims' financial records. During multi-million-dollar business transactions, the Burtons

---

[1] Based on the Court's own search of the AZDPS website, the direct link to this entry is https://www.azdps.gov/news/releases/911 (last visited April 19, 2021).

> obtained goods and services in the names of the victims and defrauded victims out of more than $100,000.
>
> Additionally, the Burtons defrauded the Arizona Department of Economic Security by falsifying revenue records and unlawfully collecting more than $20,000 in Supplemental Nutrition Assistance Program (SNAP) benefits (food stamps). During this time, the Burtons were also attempting to acquire a 2.2 million-dollar business.
>
> Kent and Carly Burton were booked into the Maricopa County Sheriff's Office 4th Avenue Jail.
>
> The Department report number is AZ1800387253.

(*Id.*)

Plaintiffs argue that, to date, they have not been formally charged with the offenses listed in the press release, and their names do not show up in the online court records for the Maricopa County Superior Court, the Maricopa County Justice Courts, or any local City Courts, yet the statements in the press release falsely and affirmatively claim that Plaintiffs defrauded individuals and the government. (Doc. 26 at 3.)

**IV.   Discussion**

    **A.   Likelihood of Success on the Merits**

Plaintiffs argue that they are likely to succeed on the merits of their underlying defamation and libel claims stemming from the AZDPS press release.

        **1.   Defamation/Libel Legal Standards**

Under Arizona Law, a private person suing for defamation/libel[2] must prove the following: the Defendant (1) published a false and defamatory statement regarding the

---

[2] Defamation can be based on either libel or slander; generally, "libel" pertains to written or visual defamation, and "slander" pertains to oral defamation. *Boswell v. Phoenix Newspapers, Inc.*, 730 P.2d 178, 183 n.4 (Ariz. Ct. App. 1985), *approved as supplemented*, 730 P.2d 186 (1986). Additionally, libel *per se* consists of "communications which on their face falsely tend to impeach one's honesty, integrity, or reputation"; whereas, libel *per quod* pertains to communications that are only libelous when considering extrinsic circumstances. *Id.*

- 7 -

person; (2) knowing that the statement was false and defamed the other; and (3) acted in reckless disregard of or negligently failed to ascertain these matters. *Peagler v. Phoenix Newspapers, Inc.*, 560 P.2d 1216, 1222 (Ariz. 1977) (citing Restatement (Second) of Torts § 580B (1975)). The "publication must reasonably appear to state or imply assertions of material fact that are provably false." *Yetman v. English*, 811 P.2d 323, 328 (Ariz. 1991). But "[s]ubstantial truth of an allegedly defamatory statement may provide an absolute defense to an action for defamation." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 449 (Ariz. Ct. App. 2015)

"A publication which impeaches the honesty, integrity, or reputation of a person, or which is damaging to his professional reputation is libelous per se and presumptive damages may be awarded without proof of special damages." *Hirsch v. Cooper*, 737 P.2d 1092, 1096 (Ariz. Ct. App. 1986).

### 2. Analysis

Plaintiffs contend that the statements in the press release that Plaintiffs "falsified the victims' financial records," "obtained goods and services in the names of the victims and defrauded victims out of more than $100,000," and "defrauded the Arizona Department of Economic Security by falsifying revenue records and unlawfully collecting more than $20,000 in Supplemental Nutrition Assistance Program (SNAP) benefits (food stamps)" are defamatory because they "impugn Plaintiffs' honesty, integrity, or reputation, impute the commission of a crime, or have injured Plaintiffs in their profession, trade or business." (Doc. 26 at 5.)

Plaintiffs also contend that the above statements are false. (*Id.* at 3.) In support, they produce copies of the Maricopa County Superior Court's May 17, 2019 "Final Release Order[s] and Order[s] Regarding Counsel," showing "No Probable Cause Found" as to any of the charges against Plaintiffs and setting the dates for a status conference and preliminary hearing at the Southwest Regional Court Center. (Doc. 26-1, Ex. A.)

Plaintiffs argue that they are also able to show actual damages, including that Carly lost her job and Plaintiffs' business has been damaged by customers, suppliers, vendors,

and employees not wanting to work with Plaintiffs due to the press release. (*Id.* at 6.) And they argue that, even without these showings, damages may be presumed in this case because Defendants' actions constitute libel per se. (*Id.*) Plaintiffs support their claims of actual damages with sworn declarations. (*See* Doc. 26-3, Ex. C (Brigham Decl.) ¶¶ 6−12; Doc. 26-4, Ex. D (Carly Decl.) ¶¶ 2−9.)

Defendants argue in their Response that Plaintiffs have failed to show a likelihood of success on the merits because they have not set forth any facts or evidence showing that the statements made in the press release were false, that Defendants knew they were false, or that Defendants acted negligently or with reckless disregard to the truth or falsity of these statements when the AZDPS published them. (Doc. 30 at 5.) Defendants point out that the Maricopa County Superior Court's "no probable cause" order, upon which Plaintiffs principally rely, merely shows that Judge Carson did not make a probable cause finding at the time of Plaintiffs' arrests. Defendants argue that this is substantively different from making an affirmative finding that there was no probable cause and does not establish that the allegations against Plaintiffs were false. (*Id*. at 4.)

To demonstrate the limitation of Judge Carson's findings, Defendants produce a transcript of the courtroom recordings from Plaintiffs' initial appearance. In it, Judge Carson explained to Plaintiffs that the probable cause statement presented to her was "vague, very broad, and this court just has complete inability to pin down a [probable cause] finding for any of the charges at this point." (Doc. 30-1 at 3.)[3]

Defendants also produce the Maricopa County Superior Court "Release Questionnaire[s]" for Plaintiffs, which contain the probable cause statements proffered by Defendant Watt as the arresting officer. (Doc. 30-2 at 2−21.) Defendants argue that these statements, which Watt made under penalty of perjury, show that Watt had probable cause for Plaintiffs' arrests and demonstrate that the State did not act negligently or with reckless

---

[3] The transcript was prepared by counsel of record for Defendants, Christopher J. Feasel of the Arizona Office of the Attorney General, and is based on Feasel's review of the in-courtroom recordings of the relevant proceedings. (Doc. 30-1 (Feasel Decl.) ¶¶ 1−2.)

- 9 -

disregard when the AZDPS published the June 24, 2019 press release. (Doc. 30 at 5.) Among other things, Watt's probable cause statements purport to identify multiple instances in which Brigham knowingly converted checks owed to another, provided false or inaccurate financial information during business dealings, and Plaintiffs falsely underreported or concealed their income to receive SNAP benefits. (*See, e.g.*, Doc. 30-2 at 3−8.)

On the above record, Plaintiffs have not shown that they are likely to succeed on the merits of their defamation claim. As an initial matter, Plaintiffs do not dispute that much of the information in the AZDPS press release, including that they were arrested, were charged with the stated offenses, and were booked into the Maricopa County 4th Avenue Jail, is true. Their claim therefore rests solely on the statements regarding the findings of AZDPS detectives throughout their investigation of Plaintiffs, including that Plaintiffs "falsified the victims' financial records," "defrauded victims out of more than $100,000," and "defrauded the [State]" of more than $20,000 in food stamps," all of which, Plaintiffs argue, the press release "affirmatively, yet falsely" presents as facts. (Doc. 26 at 3.)

As to the alleged falsity of these statements, Plaintiffs rely exclusively on the Maricopa County Superior Court's "no probable cause" finding in its release order. (*Id.*) This order, coupled with Judge Carter's findings at Plaintiffs' initial appearances that Defendant Watt's probable cause statements were "vague, very broad," and did not permit her "to pin down a PC finding of the charges at this point," provides some support for questioning the veracity of the charges against Plaintiffs. But Plaintiffs present no other evidence and make no direct statements in their Motion or in their affidavits that the actions attributed to them in the press release are false. Nor do they present any basis upon which to find that the accusations, if untrue, were known to be false by Defendant Watt, who swore to the findings in his proffered probable cause statements before the Maricopa County Superior Court, or to the State when it published the AZDPS press release.

Plaintiffs' additional assertion that they have, as yet, to be charged with any crimes stemming from their May 2019 arrests, while suggesting that the case against them may be

weak, also does not show that the accusations against them in the press release are false or, if so, were "knowingly false" on the parts of Defendants. Absent more, Plaintiffs' have not shown a likelihood of success on the merits of their defamation claim and are therefore not entitled to preliminary injunctive relief.

### B.     Irreparable Harm

In the alternative, even if Plaintiffs have raised "serious questions" going to the merits of their defamation/libel claim, they have not made a showing of irreparable harm. To obtain preliminary injunctive relief, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury. *See Conn. v. Mass.*, 282 U.S. 660, 674 (1931) (an injunction is only appropriate "to prevent existing or presently threatened injuries"). Here, Plaintiffs claim that the June 24, 2019 press release caused the loss of Carly's job, damage to Plaintiffs' reputations, and the loss of business prospects. They do not present any facts, however, showing that the continued existence of the nearly two-year-old press release on the AZDPS website is a source of ongoing or future harm to them. At most, they appear to suggest that potential future employers, investors, or other business interests may search for and locate the press release about Plaintiffs' arrests on the AZDPS website and thereby be dissuaded from engaging in business with them. But this supposition is merely speculative, and speculative injury is insufficient to support the extraordinary remedy of preliminary injunctive relief. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (internal citation omitted) ("Speculative injury does not constitute irreparable injury to warrant granting a preliminary injunction."). "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Id.*

Absent the requisite showing of irreparable harm, Plaintiffs Motion for Preliminary injunction necessarily fails, and the Court will deny the Motion without prejudice. *See Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011)  (because the plaintiffs failed to show they are likely to suffer irreparable harm in the absence of

preliminary relief, the court need not address the remaining elements of the preliminary injunction standard).

**IT IS ORDERED:**

    (1)    The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Preliminary Injunction (Doc. 26).

    (2)    Plaintiff's Motion for Preliminary Injunction (Doc. 26) is **denied**.

Dated this 23rd day of April, 2021.

James A. Teilborg
Senior United States District Judge