1

2  WO

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Brigham Burton, et al.,                    No.    CV-20-00920-PHX-JAT (JZB)

10                        Plaintiffs,

11  v.                                          **ORDER**

12  Arizona Department of Public Safety, et

13  al.,

14                        Defendants.

15

16         Plaintiffs Brigham and Carly Burton, husband and wife, brought this action through

17  counsel pursuant to 42 U.S.C. § 1983 and state law.[1]  Defendants the State of Arizona and

18  Arizona Department of Public Safety (DPS) Detective Kevin Watt move for summary

19  judgment.  (Doc. 72.)  The Motion is fully briefed (Docs. 79, 82), and the Court held oral

20  argument on June 24, 2025.

21         The Court will grant the Motion for Summary Judgment.

22  **I.    Background**

23         In their 9-count First Amended Complaint (FAC), Plaintiffs allege that Defendants

24  falsely arrested Plaintiffs and failed to provide them *Miranda* warnings in violation of their

25  Fourth, Fifth, and Fourteenth Amendment rights. (Doc. 11.)  Plaintiffs further allege

26  several state law claims against Defendants, including for defamation, libel, false light, and

27  _____

28         [1] Plaintiffs initiated this action by filing a pro se Complaint (Doc. 1), but they
    subsequently obtained counsel.  (*See* Doc. 9.)

intentional infliction of emotional distress. (*Id.*) Plaintiffs' claims arise from their May 16, 2019 arrests by Defendant Watt and other DPS officers on charges of aggravated taking the identity of another or entity, forgery, fraudulent schemes and artifices, fraudulent schemes and practices/willful concealment, perjury by inconsistent statements, theft, and unlawful use of food stamps. (Doc. 11 ¶ 39.)

On September 1, 2021, by Stipulation of the parties (Doc. 37), the Court stayed this action under the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971), pending resolution of Plaintiff Brigham "Brig" Burton's (Plaintiff Brig's) criminal case in the Maricopa County Superior Court, Case No. CR2021-001912-001. (Doc. 38.)

On February 2, 2024, upon notice from Defendants that Plaintiff Brig's criminal proceedings and sentencing had concluded (Doc. 51), the Court lifted the stay and set a case management conference. (Doc. 53.) The Court subsequently amended its Scheduling Order and set new deadlines for discovery and dispositive Motions. (Doc. 65.) On January 10, 2025, Defendants timely filed their Motion for Summary Judgment, seeking summary judgment in their favor on all claims. (Doc. 72.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

1  jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

2  242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

3  Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its

4  favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

5  it must "come forward with specific facts showing that there is a genuine issue for trial."

6  *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

7  citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

8    At summary judgment, the judge's function is not to weigh the evidence and

9  determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,

10  477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw

11  all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited

12  materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

13  **III.   Facts**[2]

14    In April 2018, an alleged victim of Plaintiff Brig, Tyson Kent Stratton, notified DPS

15  through his attorney, Veronica Manolio, of suspected criminal activity by Plaintiff Brig.

16  (Doc. 73, Defs.' Statement of Facts (DSOF) ¶¶ 1, 3.)[3] On or about September 25, 2018,

---

18
19    [2]In their Separate Statement of Facts (Doc. 79-1), Plaintiffs set forth 6 paragraphs
20  of controverting facts and 37 paragraphs of additional facts. Most of Plaintiffs' additional
21  facts do not set forth discrete facts about Plaintiffs' arrests but instead pick apart Defendant
   Watt's deposition testimony about additional facts defense counsel introduced at
   deposition. Even if these facts are tangentially related to Plaintiffs' arrests, Plaintiffs fail
22  to provide sufficient context to place them in any coherent timeline with other facts. More
23  crucially, they fail to provide any support other than that counsel asked Defendant Watt
   about them. In its summary of the facts, the Court will include only properly supported
24  facts that are relevant to the merits of Plaintiffs' claims and clearly referred to in Plaintiff's
25  memorandum of law. The Court will not attempt to set forth any facts of unknown context
   and relevance that Plaintiffs, themselves, fail to incorporate in any meaningful way in their
26  substantive arguments.

27    [3] Plaintiffs claim to dispute this fact, but they only dispute the veracity of Ms.
   Manolio's complaint against Plaintiff Brig and question why DPS decided to pursue it;
28  they do not materially dispute that DPS received a complaint. (Doc. 79-1 Pls.'
   Controverting Statement of Facts (PCSOF) ¶ 1.)

the DPS General Investigation Unit assigned Defendant Watt to investigate the complaint. (*Id.* ¶ 2.)  Prior to March 2018, when he was promoted to detective, Defendant Watt worked in the DPS Highway Patrol Division.  (Doc. 79-1 at 2, Plaintiff's Additional Statements of Fact (PASOF) ¶ 1.)  At that time, he had 14 years' experience as a law enforcement officer and had conducted many criminal investigations.  (*Id.* ¶ 4.)

### A.    Defendant Watts' Criminal Investigation

On September 26, 2018, Defendant Watt met with Ms. Manolio, who explained to him that she represented Mr. Stratton in a lawsuit against Plaintiff Brig, and she had information that others were in the same situation as her client, causing her to believe Plaintiff Brig had a pattern of engaging in criminal conduct.  (*Id.* ¶ 4; Doc. 73-1 at 11.)[4] Ms. Manolio also said she believed Plaintiffs were illegally collecting food stamps from the Arizona Department of Economic Security (DES).  (Doc. 85, Watt Suppl. Decl. ¶ 2.)

During his investigation, Defendant Watt discovered multiple victims of Plaintiff Brig's alleged schemes, which centered around buying and selling businesses.  (Doc. 73-1, Ex. 1 (Watt Decl.) ¶ 5.)[5]

---

[4] Once again, Plaintiffs claim to dispute these facts, but they instead introduce additional facts about Ms. Manolio and engage in argument about the reliability of the information she conveyed; they do not dispute that she conveyed this information to Defendant Watt.  (PCSOF ¶ 4.)  The Court will not continue to note purported disputes of fact that fail to address the facts asserted.  Pursuant to Rule 56.1(b) of the Local Rules of Civil Procedure, Plaintiffs are free to introduce, and did introduce, additional facts to those asserted by Defendant (*see* Doc. 79-1 at 2−7), and they may argue via proper citation in their memoranda of law how the additional facts matter to their claims.  *See* LRCiv 56.1(e).

[5] To establish the relevant facts from his investigation, Defendant Watt proffers his General Report (Doc. 73-1 at 10−15), his Synopsis for the Report (*id.* at 57−60), and his declaration, in which he authenticates these documents and states that the facts contained therein are based on his personal knowledge and information he relied on in his investigation.  (Doc. 73-1 at 5 (Watt Decl.) ¶ 8.)  Because Defendant Watt's General Report and Synopsis are undated, and because Defendant Watt's investigation continued after Plaintiffs' arrests, the Court ordered Defendants to produce a supplemental declaration clarifying which facts were known to Defendant Watt at the time of Plaintiffs' arrests.  *See John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008) (when determining whether probable cause exists, the Court looks to the totality of the circumstances known to the

### 1.    Kevin Erdman (Kebko Signs)

On October 9, 2018, Defendant Watt conducted an audio recorded interview with Kevin Erdman.  (DSOF ¶ 7.)  Mr. Erdman claimed that, in June 2010, he sold his business Kebko Signs to Plaintiff Brig for $110,000 with $55,000 down, and the remaining $55,000 on a note to Mr. Erdman at 6% interest.  (*Id.* ¶ 7−8.)  Just days after the sale, Plaintiff Brig told Mr. Erdman he could not obtain financing to cover operating costs, so not wanting the business to fail, Mr. Erdman gave Plaintiff Brig access to his own credit accounts, including lines of credit at Wells Fargo and Johnson Plastics.  (*Id.* ¶¶ 8−9.)  According to Mr. Erdman, Plaintiff Brig incurred debts of $17,560.31 at Wells Fargo, $13,042.65 plus fees at Johnson Plastics, and $2,247.53 at McGraw-Hill Dodge, which he failed to pay, so Mr. Erdman paid these debts.  (*Id.* ¶ 10−11.)  Additionally, Plaintiff Brig cashed four checks payable to Kebko Signs that were, per the purchase agreement, payable to Mr. Erdman, and he made an unauthorized purchase on Mr. Erdman's credit card.  (*Id.* ¶¶ 12−13.)  Mr. Erdman filed a UCC lien on Kebko Sign's assets, and Plaintiff Brig unilaterally and without permission cancelled the lien.  (*Id.* ¶ 14.)

Mr. Erdman filed a civil lawsuit against Plaintiff Brig, and a jury found in favor of Mr. Erdman and awarded him $39,917.48 in compensatory damages and $93,235.60 in punitive damages, and the trial court awarded him $51,556.28 in attorney fees and costs.  (*Id.* ¶¶ 15−16; Doc. 73-1, Ex. 2.)  Plaintiff Brig appealed the judgment to the Arizona Court of Appeals, and on May 26, 2016, the appellate court affirmed the judgments of the trial court for both Mr. Erdman and another alleged victim of Plaintiff Brig, Kerry Lechner.  (Doc. 73-1, Ex. 2.)

### 2.    Paula and Don Gatzemeier (Kebko Signs)

In July 2011, while he was still in debt to Mr. Erdman for Kebko signs, Plaintiff

---

arresting officer at the time of the arrest).  Where the General Report or Synopsis contain facts showing when and how Defendant Watt discovered the information therein, the Court has included this information.  The Court has otherwise relied on Defendant Watt's Supplemental Declaration (Doc. 85), to the extent Plaintiffs, who were given an opportunity to respond to the additional filing, do not materially dispute the facts therein.

Brig resold the business to Paula and Don Gatzemeier for $235,000, which was $125,000 more than he paid Mr. Erdman for the company.  (DSOF ¶ 20; Doc. 73-1 at 26.)  By then, Plaintiff Brig had accumulated approximately $60,000 in losses at Kebko Signs, but he never disclosed these losses to the Gatzemeiers.  (*Id.* ¶ 23; Doc. 73-1 at 26.)  Plaintiff also falsely stated in the purchase agreement that the note he used to purchase the company was current.  (DSOF ¶ 21.)

On October 30, 2018, Defendant Watt conducted an audio interview with Paula Gatzemeier, and Ms. Gatzemeier explained that, prior to selling them Kebko Signs, Plaintiff Brig showed them a list of back-log contracts, which are contracts waiting to be filled that are commonly used to show the value of a company, to falsely boost the value of Kebko Signs.  (Doc. 73-1 at 26.)  After the sale, Ms. Gatzemeier started calling the companies with back-logged contracts, and she learned that the back-logged contracts were not active contracts, as Plaintiff Brig represented.  (*Id.*)  She also discovered that some active contracts were obtained through underbidding, costing much more to fulfill than they were worth, resulting in net losses to the company.  (*Id.* at 27.)  Ms. Gatzemeier also learned that some of the claimed contracts were only bids, not awarded contracts.  (*Id.*)  Ms. Gatzemeier explained to Defendant Watt that this too artificially inflated the value of the company because companies typically place significantly more bids than they win, and according to Ms. Gatzemeier, "not until they're awarded would you ever consider calling them back-logged."  (*Id.*)

While he was misrepresenting the value and profitability of Kebko Signs to the Gatzemeiers, Plaintiff Brig was sending text messages to Mr. Erdman claiming he could not make timely payments on his outstanding note because the company was losing money.  (*Id.*)  Even though Plaintiff Brig profited by the sale of Kebko Signs to the Gatzemeiers, he did not reveal this to Mr. Erdman or use any of the profits to repay Mr. Erdman and instead tried to negotiate a lower payoff amount with Mr. Erdman due to the actual sinking value of the company.  (*Id.*)

Sometime after Mr. Erdman filed his civil lawsuit against Plaintiff Brig, the

Gatzemeiers obtained counsel and demanded that Plaintiff Brig reform the purchase price of Kebko Signs by $45,316 to reflect its actual value, and they were able to settle their claims without going to trial. (*Id.* at 28−29.)

### 3.    Mr. Lechner (House Hunters)

Based on the facts discussed in the May 26, 2016 Arizona Court of Appeals order addressing both Mr. Erdman's and Mr. Lechner's civil claims, in 2009, Plaintiff Brig purchased House Hunters, a magazine, for $28,000, and he decided to sell it one year later. (Doc. 73-1 at 217 ¶ 12.)  In October 2010, Mr. Lechner expressed interest in buying the company, and Plaintiff Brig provided him some financial statements and personal assurances, but no verifying information, such as the company's top ten paying clients or companies that printed and distributed the magazine. (*Id.* at 217−18.)  In December 2010, Plaintiff Brig sold House Hunters to Mr. Lechner for $98,000, with $20,000 down and the rest on a promissory note. (*Id.*; DSOF ¶ 17.)

From January to June 2011, Mr. Lechner operated House Hunters at a loss each month, so he began to question the reliability of Plaintiff Brig's financial statements and representations. (Doc. 73-1 at 218.)  He later sued Plaintiff Brig and Plaintiff Brig's company Zyrax over the transaction, and a jury found in his favor and awarded him $25,793.10 in compensatory damages against Zyrax, $30,346.19 in compensatory damages against Plaintiff Brig, and $15,000 in punitive damages against both Zyrax and Plaintiff Brig. (*Id.* ¶ 19.)  The court awarded Mr. Lechner $24,605 in attorneys' fees and costs. (*Id.*)  As noted, these awards were affirmed on appeal. (Doc. 73-1 at 225.)

### 4.    DES

From 2012 through 2016, Plaintiffs received food stamps. (DSOF ¶ 29; Doc. 73-2 at 27 (Pl. Carly Dep. at 19−24.)  Following Defendant Watt's meeting with Ms. Manolio, Deputy County Attorney Erica Johnson subpoenaed DES for all records related to Plaintiffs' receipt of Supplemental Nutritional Assistance Program (SNAP) benefits. (Watt Supp. Decl. ¶ 3.)  On December 10, 2018, Defendant Watt received notice that the documents were ready, and he picked them up from DES and reviewed them over the next

days, weeks, and months prior to Plaintiffs' arrests.  (*Id.* ¶¶ 5, 6.)  Among other things, an income reporting table from DES showed that Plaintiff Carly Burton (Plaintiff Carly) reported to DES that the family income for 2014 was $19,980.65.  (DSOF ¶ 30; Watt Supp. Decl. ¶¶ 9, 10.)  Defendant Watt also obtained Plaintiffs 2014 tax returns, which he scanned into his computer on February 6, 2019.  ( Watt Supp. Decl. ¶ 12.)  The tax returns showed that, for the 2014 tax year, Plaintiffs reported $69,487 adjusted gross income on their federal income taxes and $62,587 adjusted gross income on their Arizona income taxes.  (DSOF ¶ 31.)  Defendant Watt wrote in his General Report,

> If you look at tax year 2014 alone, you would see the Burton's reported a federal adjusted gross income of $69,487 dollars (Supportive Document V.4.5). The Burton's tax return for 2014 alone is more than the total amount of reported income to DES combined over a five-year period. The Burton's received over $22,000 dollars in SNAP benefits between November 1, 2012 and January 1, 2017.

(Doc. 73-1 at 31.)  The federal adjusted income amount on Plaintiff's 2014 Arizona tax return (Form 140) shows that a capital gain of over $70,000 factored into that year's reported income.  (Doc. 73-1 at 187; Doc. 87-2 at 2.)

While Plaintiffs were receiving food stamps, Plaintiff Brig attempted to purchase a $2.2 million business.  (DSOF ¶ 32.)

### 5.    Desert Schools Financial Credit Union ("Desert Schools")

On December 10, 2015, Plaintiff Brig applied for a business account at Desert Schools on behalf of Agricann, LLC.  (DSOF ¶ 25: Doc. 73-1 at 211−12.)  During his investigation, Defendant Watt subpoenaed Desert Schools for this application, and he received it on or about January 12, 2019.  (Watt Supp. Decl. ¶¶ 19−20.)  A printed notice on the application states, "Desert Schools will not open accounts for members engaged in any internet gambling business, money service businesses, or those involving medical marijuana and will restrict or close existing accounts found to be involved in such transactions." (Doc. 73-1 at 211.)  On his Agricann application, Plaintiff Brig stated his occupation was "real estate management" and the nature of the business was "other

activities related to real estate." (DSOF ¶ 26; Doc. 73-1 at 211.) Plaintiff Brig also created a Crowdfunder.com webpage for Agricann, which Defendant Watt discovered on February 7, 2019. (Watt Supp. Decl. ¶ 23.) The webpage identified Agricann as a "medical marijuana grow operation." (DSOF ¶ 27: Doc. 73-2 at 13−15.)

Defendant Watt included copies of both the webpage and the Desert Schools business account application in his General Report. (Doc. 73-1 at 32, 37.) He wrote that Plaintiff Brig's motive for describing Agricann as a real estate-related company on the Desert Schools business account application was "most likely because [of the] statement from the credit union advising they would not open accounts for businesses related to medical marijuana." (*Id.* at 37.)

In an October 2022 disclosure statement in a civil lawsuit in the Arizona Superior Court in Maricopa County, Plaintiff Brig stated that Agricann "was formed for the purpose of growing and cultivating medical marijuana (MMJ) crops and products." (DSOF ¶ 27; Doc. 73-2 at 3.)

**B.    Search Warrant Execution and Arrests**

On or about May 15, 2019, Defendant Watt applied for a search warrant to search Plaintiffs' Chandler, Arizona home. (DSOF ¶ 33.) In his search warrant affidavit, Defendant Watt detailed Plaintiff Brig's alleged fraudulent schemes and artifices, including a scheme to purchase a $2.2 million business using falsified bank documents while, at the same time, Plaintiffs were collecting SNAP benefits based on significant under representations of their income to DES. (Doc. 73-1 at 72−73.) Maricopa County Superior Court Judge Jane Mclaughline reviewed and signed search warrant SW2019-00628. (DSOF ¶ 34.)

On May 16, 2019, Defendant Watt executed the search warrant. (*Id.* ¶ 35.) That same day, he arrested Plaintiff Brig on charges of fraudulent schemes and artifices, willful concealment, forgery, perjury by making inconsistent statements, aggravated identity theft, theft, unlawful use of food stamps, and residential mortgage fraud. (*Id.* ¶ 36.) He arrested Plaintiff Carly on charges of forgery, unlawful use of food stamps, and theft. (*Id.* ¶ 37.)

Plaintiff Carly subsequently requested to speak to Defendant Watt, and after Defendant Watt provided her *Miranda* warnings, she agreed to answer questions.  (*Id.* ¶ 38.)

During her post-arrest interview, Plaintiff Carly said that she did not report a $4,000 per month salary Plaintiff Brig was collecting from Agricann on their food stamp application to DES because Plaintiffs owed money to other businesses, and Plaintiff Brig was using this income to pay the other businesses.  (*Id.* ¶ 39.)  She acknowledged that, during the time they were collecting food stamps, Plaintiff Brig was also attempting to purchase a $2.2 million business.  (*Id.* ¶ 40.)

On June 24, 2019, DPS employees posted an article about Plaintiffs' arrest on the DPS website.  (*Id.* ¶ 51.)

**C.    Criminal Proceedings**

On May 17, 2019, Plaintiffs made their initial appearances before Maricopa County Superior Court Commissioner Michelle Carson, and Commissioner Carson found no probable cause to hold Plaintiffs and ordered their release.  (*Id.* ¶ 42; Doc. 73-3 at 57.)  On August 11, 2021, Plaintiff Brig was indicted by a grand jury on five criminal counts: (1) fraudulent schemes and artifices, a class 4 felony, (2) forgery, a class 4 felony, (3) forgery, a class 4 felony, (4) fraudulent schemes and artifices, a class 4 felony, and (5) theft, a class 2 felony.  (DSOF ¶ 43.)  Count 3 of the indictment stemmed from the forgery Plaintiff Brig allegedly committed on his Desert Schools business account application for Agricann on December 15, 2015.  (*Id.* ¶ 44.)

During his criminal case, Plaintiff Brig moved the criminal court to remand the grand jury determination for a redetermination of probable cause because Commissioner Carson found no probable cause at Plaintiffs' initial appearance and because Defendant Watt was a Defendant in this lawsuit when he testified to the grand jury.  (*Id.* ¶ 45.)  The criminal court denied the motion.  (*Id.*)

On August 28, 2023, Plaintiff Brig and his attorney engaged in a settlement conference with the prosecutor before Maricopa County Superior Court Judge Cohen.  (*Id.* ¶ 46.)  The court informed Plaintiff Brig of his charges, the possible range of sentence(s)

if found guilty, and his pertinent constitutional rights.  (*Id.*)  After Plaintiff Brig conferred with his attorney, Judge Cohen set a change of plea hearing for September 18, 2023.  (*Id.*)

At the hearing on September 18, 2023, Plaintiff Brig pleaded guilty to Count 3, which was amended to a charge of criminal possession of a forgery device, a class 6 felony, arising out of the December 10, 2015 Desert Schools business account application.  (*Id.* ¶ 47.)  In exchange for his guilty plea, Plaintiff Brig was to be placed on probation with a jail term to be determined by the sentencing judge, and the State agreed to dismiss Counts 1, 2, 4, and 5 and not to bring charges of taking the identity of another, aggravated taking the identity of another, additional counts of forgery, fraud schemes, fraud schemes – willful concealment, unlawful use of food stamps, or theft against either Plaintiff Brig or Plaintiff Carly.  (*Id.* ¶ 48.)  On January 2, 2024, Plaintiff Brig, through his attorney, submitted a sentencing memorandum to the court, stating he made "a grave mistake in his actions and took responsibility in plea entry as appropriate."  (*Id.* ¶ 49.)

On January 12, 2024, Judge Cohen sentenced Plaintiff Brig to a 3-year term of supervised probation with a deferred jail term for 6 months.  (*Id.* ¶ 50.)  Plaintiff Brig's jail term may be deferred or deleted upon recommendation of the Adult Probation Department.  (*Id.* ¶ 50.)

**IV.    Discussion**

   **A.    Section 1983 Claims**

      **1.    Counts I and III (False Arrest)**

Plaintiffs assert § 1983 claims for false arrest under the Fourth and Fourteenth Amendments against the State and Defendant Watt in Count I and against Defendant Watt in Count III.  (Doc. 11 at 8, 9.)  The parties stipulated to the dismissal of the State in Count I, so Defendant Watt is the only remaining Defendant in both counts.  (*See* Doc. 24.)[6] Because Counts I and III contain the same factual allegations and claims, the Court will

---

[6] Plaintiffs also stipulated to the dismissal of Count II (intentional infliction of emotional distress) as to Defendant Watt only and Count IV (municipal liability under § 1983) against the State.  (Doc. 24.)

dismiss Count III as duplicative of Count I.  Additionally, because the alleged misconduct arises in the context of Plaintiffs' arrests, it is properly asserted as a Fourth Amendment, not a Fourteenth Amendment, claim.  *See Reed v. Hoy*, 909 F.2d 324, 329 (9th Cir. 1989) (*overruling on other grounds recognized by Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 956 n.14 (9th Cir. 2010) ("[C]laims arising before or during arrest are to be analyzed exclusively under the fourth amendment's reasonableness standard rather than the substantive due process standard")); *Fontana v. Haskin*, 262 F.3d 871, 881 (9th Cir. 2001) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) ("If a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process")); *cf. Graham v. Connor*, 490 U.S. 386, 394 (1989) (Fourth Amendment excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard").

The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.  U.S. Const. amend. IV.  To prevail on a Fourth Amendment false arrest claim, a plaintiff must show there was no probable cause for the arrest.  *See Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) (citation omitted).  Probable cause exists when an officer has reasonably trustworthy information of facts and circumstances that are sufficient to justify the belief that an offense has been or is being committed.  *Stoot v. City of Everett*, 582 F.3d 910, 918 (9th Cir. 2009) (citing *Brinegar v. United States*, 338 U.S. 160, 175−76 (1949)).  "Mere suspicion, common rumor, or even strong reason to suspect are not enough . . . .  There must be some objective evidence which would allow a reasonable officer to deduce that a particular individual has committed or is in the process of committing a criminal offense"  *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (internal citation omitted).

"Probable cause is an objective standard and the officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes." *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008).  When determining whether probable cause exists, the Court looks to the totality of the circumstances known to the arresting officer at the time of the arrest.  *Id.* (internal quotation marks and citation omitted).  "In applying these standards, [the Court] must consider all the facts known to the officers and consider all the reasonable inferences that could be drawn by them before the arrest."  *United States v. Martin*, 509 F.2d 1211, 1213 (9th Cir. 1975).  "[P]robable cause must be evaluated from the perspective of 'prudent men, not legal technicians,'" *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (quoting *Brinegar v. United States,* 338 U.S. 160, 176 (1949)).  Where any potential crime is supported by probable cause, the arrest is justified.  *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 952 (9th Cir. 2003), *overruled on other grounds by Edgerly v. City & Cnty. of San Francisco,* 599 F.3d 946, 956 n. 14 (9th Cir. 2010); *Barry v. Fowler*, 902 F.2d 770, 773, n.5 (9th Cir. 1990); *Lacy v. Cty. of Maricopa*, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008).

Probable cause for the arrest is a complete defense to any claim under § 1983 against police officers for wrongful arrest or false imprisonment.  *See Beauregard v. Wingard*, 362 F.2d 901, 903 (9th Cir. 1966) ("[W]here probable cause []exist[s,] civil rights are not violated by an arrest even though innocence may subsequently be established").

### a.    Plaintiff Brig

Defendants argue that Plaintiff Brig's false arrest claim fails as a matter of law because, among other offenses, Defendant Watt had probable cause to arrest Plaintiff Brig for forgery based on his representation of Agricann as a real estate business on his Desert Schools business account application, and probable cause for any offence is sufficient to justify an arrest.  (Doc. 72 at 3.)

Under Arizona Revised Statute § 13-2002, "[a] person commits forgery if, with intent to defraud, the person:

1  |  1. Falsely makes, completes or alters a written instrument; or

2  |  2. Knowingly possesses a forged instrument; or

3  |  3. Offers or presents, whether accepted or not, a forged instrument or one that contains false information.

4

5  Ariz. Rev. Stat. § 13-2002.

6  |  The evidence Defendant Watt compiled in his General Report prior to Plaintiff

7  Brig's arrest shows that, on December 10, 2015, Plaintiff Brig completed a written

8  instrument—the Desert Schools business account application—that contained a warning

9  that Desert Schools does not open accounts for businesses "involving medical marijuana,"

10  and in completing that application, Plaintiff Brig described Agricann's business as

11  involving "activities related to real estate," even though his Crowdfund.com site for the

12  same business identified Argricann as a "medical marijuana grow operation." (*See*

13  Doc. 73-2 at 13.) Although the website is undated, it contains work experience for Plaintiff

14  Brig dating from "January 2016 − present," showing it was either created or updated after

15  Plaintiff Brig applied for an Agricann business account, and it continued to present

16  Agricann as a marijuana grow enterprise. (*Id.* at 13−14.) A reasonable officer knowing

17  these facts could have reasonably concluded Plaintiff Brig committed forgery by

18  "complet[ing]" and "presen[ting]" a "written instrument" to Desert Schools that "contained

19  false information" with the intent to defraud the bank into opening an account for a business

20  that would not otherwise qualify for a business account. Ariz. Rev. Stat. § 13-2002.

21  |  Plaintiffs do not meaningfully argue otherwise. They note that the warning Desert

22  Schools placed on its business account application excluding medical marijuana-related

23  businesses from opening accounts also stated that Desert Schools would "restrict or close

24  existing accounts found to be involved in such transactions." (Doc. 79 at 5 (quoting

25  Doc. 73-1 at 211).) Plaintiffs argue that this shows Desert Schools already had a remedy

26  for any attempt to violate its stated policy, and the warning, "did not state that the account

27  holder would be subject to arrest and criminal prosecution." (*Id.*)

28

This does not mean, though, that making false statements on the application did not constitute forgery under Arizona law or that Desert Schools was not the victim of a crime. There is no requirement that an entity warn of possible criminal charges for providing false information on a written instrument relied on by that entity for criminal forgery to occur. Nor does the bank's reliance on a non-criminal remedy mean a reasonable officer, knowing the above facts, would lack probable cause to make an arrest for this violation.

Plaintiffs also argue, without citing to any evidence, that "Agricann was providing real estate services to a medical marijuana dispensary and was not involved in the production or sale of medical marijuana." (*Id.* at 5.) Even if supported, this fact merely confirms that, broadly speaking, Agricann was a business "involving medical marijuana" and was therefore ineligible for a business account under Desert Schools' written policy. Moreover, the relevant question for probable cause purposes is not whether the statements Plaintiff Brig made about Agricann on his business account application were false and meant to defraud, but whether a reasonable officer in Defendant Watt's position had sufficiently reliable information to believe that they were. *Stoot*, 582 F.3d, 918. Plaintiffs do not dispute the authenticity of Plaintiff Brig's business account application or his Crowdfund site; nor do they dispute that Defendant Watt discovered this information in his investigation prior to Plaintiff Brig's arrest. As discussed, the material differences in Plaintiff Brig's description of Agricann's business in these two documents are enough for a reasonable officer to conclude that Plaintiff Brig deliberately misrepresented the nature of Agricann on his business account application to induce Desert Schools into opening an account it would have otherwise declined. Defendant Watt therefore had probable cause to arrest Plaintiff Brig for fraud under A.R.S. § 13-2002. *See United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001) (citing *Illinois v. Gates,* 462 U.S. 213, 235 (1983) ("Probable cause exists when there is a fair probability or substantial chance of criminal activity)).

Commissioner Carson's no probable cause finding at Plaintiffs' initial appearance does not defeat this showing. When a suspect is arrested without a warrant, a judicial determination of probable cause is required "as a prerequisite to extended restraint on

liberty following arrest." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). The parties have not shown what facts or evidence were presented at Plaintiffs' initial appearance or why Commissioner Carson determined those facts fell short of establishing probable cause for Plaintiffs' continued detention. The record is replete, however, with facts about what Defendant Watt uncovered in his investigation, including the facts and evidence regarding Plaintiff Brig's Desert Schools business account application for Agricann and his separate website description of Agricann as a medical marijuana grow operation. As discussed, these facts and evidence show Defendant Watt had probable cause to arrest Plaintiff Brig for forgery under § 13-2002(A). Because probable cause to arrest is based on the totality of the circumstances known to the arresting officer(s) at the time, not what is later presented in criminal proceedings, any contrary finding at Plaintiffs' initial appearance, or even an ultimate vindication on the charges at trial, does not alter this determination. *See Beauregard*, 362 F.2d at 903.

In their Supplemental Reply to Defendant Watt's Supplemental Declaration, Plaintiffs once again argue that there was no probable cause to arrest Plaintiff Brig for forgery on the Desert Schools business account application because Plaintiff Brig applied for this account "*after* the medicinal business was sold and [Agricann's] activity consisted of real estate management and collection of note payments." (Doc. 86 at 3 (emphasis in original)). This time, they cite to Plaintiff Brig's 2024 deposition in this action to support their argument, and they also rely on this evidence for the first time to show that "the banker advised [Plaintiff Brig] to put Real Estate Management" on the application, apparently to show that Plaintiff Brig did not make this statement with the requisite intent to defraud. (*Id.*) These arguments do not alter the Court's probable cause analysis.

First, introducing new arguments and evidence in their supplemental briefing exceeds the narrow scope of the supplemental filings the Court permitted the parties to file. As noted, the Court ordered Defendant Watt to produce a supplemental declaration regarding the timeline of his investigation because his General Report is undated, and the dates when Defendant Watt discovered some of the information leading to Plaintiffs arrests

and criminal charges are not always clear from context in that report. (*See* Doc. 84.) Because the Court permitted Defendant Watt to supplement the record in this way, it also gave Plaintiffs an opportunity to respond to any additional facts Defendant Watt produced. (*Id.*) Plaintiffs apparently saw their ability to file a supplemental reply brief as an opportunity to relitigate all aspects of Defendant Watt's probable cause determination, and together with that brief, they separately filed ten exhibits, totaling more than 80 pages, in support of their arguments therein. These arguments are not properly before the Court because they rely, for the first time, on facts and evidence Plaintiff's previously failed to produce or properly identify in their summary judgment briefing, leaving Defendants without an adequate opportunity to respond. [7]

But even considering the arguments Plaintiffs assert or reassert in their Supplemental Reply, the evidence Plaintiffs now cite for the first time does not create a

---

[7] It is not clear whether Plaintiffs previously included any of the newly filed attachments in their summary judgment briefing. In their Response to Defendant's Motion for Summary Judgment, Plaintiffs attached 15 exhibits, totaling 189 pages, without providing an index or any labels from which the Court could readily identify the nature of each exhibit or its content. (*See* Doc. 79.) In their Statement of Facts, Plaintiffs cited to portions of Defendant Watt's declaration and deposition and to portions of Plaintiff Carly's deposition, which Plaintiffs identified only as "Watt decl.," "Watt dep.," and "Carly dep.," but which the Court was able to identify as Defendant's Exhibit 1 and Plaintiffs' Exhibits 8A and 9A. (*See* Doc. 79-1.) In their response memorandum, Plaintiffs additionally cited to portions of their expert report (*see* Doc. 79 at 12 (citing to Exhibits 3 and 4)) and to a copy of the article DPS posted to its website following Plaintiffs arrests (*see id.* at 15 (citing Exhibit 7)), which Defendants had already placed into evidence. Apart from these few instances, however, Plaintiffs did not direct the Court to any of their attachments in their Response; nor did they cite to any paragraphs of their Statement of Facts that "refer[red] to a specific admissible portion of the record where the [asserted] fact finds support." *See* LRCiv 56.1(b). As noted, the Court has considered any properly supported facts that are relevant to the merits of Plaintiffs' claims and that Plaintiffs clearly reference in their memorandum of law. The Court has not, however, combed through the nearly 200 pages of Plaintiffs' attachments and errata to those attachments to attempt to find support for Plaintiffs' arguments. *See Orr v. Bank of America*, 285 F.3d 764, 775 (9th Cir. 2002) (internal quotation omitted) ("Judges need not paw over the files without assistance from the parties."); *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs." ) (citation omitted).

genuine issue of material fact that Defendant Watt lacked probable cause for Plaintiff Brig's arrest. As discussed, probable cause is based on the totality of the circumstances known to the arresting officer at the time of the arrest. Here, the evidence Plaintiffs seek to introduce comes from Plaintiff Brig's 2024 deposition testimony in this action, which did not exist at the time of Plaintiffs' arrests. Plaintiffs do not argue or present any evidence that, prior to these arrests, Defendant Watt was aware that Plaintiff Brig sold Agricann's marijuana grow operations before applying for a Desert Schools business account or that a bank employee told Plaintiff Brig how to describe the business on that application. Plaintiffs instead fault Defendant Watt for not conducting a more thorough investigation, and they argue without citing to any legal authority that "controlling law emphasizes that probable cause cannot exist when law enforcement fails to corroborate key facts or ignores exculpatory evidence." (Doc. 86 at 10.)[8]

Plaintiffs are partially correct to the extent that, "[w]here probable cause has dissipated during an investigation, police officers have a duty to conduct further inquiry and reestablish probable cause before arresting the suspect." *Merritt v. Arizona*, 425 F. Supp. 3d 1201, 1212 (D. Ariz. 2019), *aff'd*, No. 21-15833, 2022 WL 3369529 (9th Cir. Aug. 16, 2022). "Once probable cause to arrest someone is established, however, a law enforcement officer is not 'required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.'" *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003) (quoting *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) (explaining that the execution or continuation of an arrest becomes illegal where "additional information obtained at the

---

[8] Elsewhere, Plaintiffs cite to *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149 (E.D. Cal. 2008) for the proposition that "a failure to adequately investigate can defeat qualified immunity and render the arrest constitutionally invalid." (Doc. 86 at 11.) But Plaintiffs do not provide a pin cite for this quotation or address the context for this assertion, and based on the Court's review, *Sanders* concerned Fourth Amendment excessive-use-of-force claims, not false arrest claims.

1  scene may indicate that there is less than a fair probability that the defendant has committed

2  or is committing a crime")).

3          Here, Defendant Watt did not merely rely on tips and hunches to determine Plaintiff

4  Brig committed fraud on his Desert Schools business account application for Agricann; he

5  subpoenaed Desert Schools for that application, wherein he discovered Plaintiff Brig did

6  not disclose that Agricann was involved in the medical marijuana business, and he

7  compared this to a webpage created by Plaintiff Brig, which clearly described Agricann as

8  a medical marijuana grow operation.  Defendant Watt did not need "[c]onclusive evidence

9  of guilt . . . to establish probable cause" but only "some objective evidence which would

10  allow a reasonable officer to deduce that a particular individual has committed . . . a

11  criminal offense."  *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984); *see also*

12  *Florida. v. Harris*, 568 U.S. 237, 243–44 (2013) (quoting *Gates*, 462 U.S. at 235 ("Finely

13  tuned standards such as proof beyond a reasonable doubt or by a preponderance of the

14  evidence . . . have no place in the [probable-cause] decision")) (alterations in original).  As

15  already, discussed, a reasonable officer knowing the above facts would have "reasonably

16  trustworthy information of facts and circumstances . . .  sufficient to justify the belief" that

17  Plaintiff Brig committed forgery with intent to defraud by inducing Desert Schools to open

18  an account it would have otherwise denied.

19          In summary, Defendant Watt had probable cause to arrest Plaintiff Brig for at least

20  one criminal offense, and because probable cause is a complete defense to a false arrest

21  claim, the Court need not discuss Defendants' alternate arguments for dismissing this

22  claim.[9]  The Court will grant summary judgment to Defendant Watt on Plaintiff's Fourth

23  Amendment false arrest claim in Count I as it pertains to Plaintiff Brig.

24

25  _____

26          [9] Defendants also rely on the grand jury indictment against Plaintiff Brig and

27  Plaintiff Brig's eventual guilty plea to a lesser offense to argue that Plaintiff Brig's false
     arrest claim fails as a matter of law (Doc. 72 at 4 (citing cases)), and they argue that, even

28  if there was no probable to arrest Plaintiff Brig, Defendant Watt is entitled to qualified
     immunity.  (*Id.* at 5.)

1

### b.    Plaintiff Carly

2    Defendant Watt arrested Plaintiff Carly for, among other things, unlawful use of

3    food stamps.  (*Id.* ¶ 37.)  Under Arizona Revised Statutes § 13-3701(A), "[a] person

4    commits unlawful use of food stamps if the person knowingly . . . acquires, possesses or

5    redeems food stamps by means of a false statement or representation, a material omission

6    or the failure to disclose a change in circumstances or by any other fraudulent device."

7    Ariz. Rev. Stat. § 13-3701(A)(1).

8    Prior to Plaintiff Carly's arrest, Defendant Watt compared Plaintiffs' $69,487

9    adjusted gross income on the couple's 2014 federal tax return with the $19,980.65 in family

10    income Plaintiff Carly reported for the same year when applying to DES for food stamps,

11    and he discovered a nearly $50,000 discrepancy.  (DSOF ¶¶ 30−31.)  He noted that the

12    income Plaintiffs reported on their 2014 tax return alone was more than the combined total

13    they reported to DES over a five-year period that they applied for and received food stamps.

14    (Doc. 73-1 at 31.)  A reasonable officer knowing this information would have probable

15    cause to believe Plaintiff Carly knowingly acquired, possessed, or redeemed food stamps

16    "by means of a false statement or representation" in violation of Arizona Revised Statute

17    § 13-3701(A)(1).

18    In their Response, Plaintiffs complain that "Defendants never explain why [DPS]

19    investigated and arrested Plaintiff Carly for the information she provided DES when DES

20    never complained or considered itself a 'victim,'" and they argue, "Plaintiff Carly was

21    never indicted[,] and charges against her were never brought before a grand jury." (Doc. 79

22    at 3.)  These arguments are irrelevant to the probable cause determination, which asks only

23    whether a reasonable officer had reasonably trustworthy information of facts and

24    circumstances at the time of the arrest that were sufficient to justify the belief that an

25    offense had been committed.  *Stoot*, 582 F.3d at 918.  As discussed, this threshold is met

26    here with respect to unlawful use of food stamps, so Plaintiffs' false arrest claim based on

27    Plaintiff Carly's arrest fails as a matter of law.

28    Once again, Plaintiffs attempt to introduce new arguments in their Supplemental

Reply, unrelated to the timeframe of Defendant Watt's investigation. For the first time, they cite to Plaintiffs' 2014 Arizona tax return to argue that "Watt missed the fact that the 2014 tax return, DOR form 140, showed $70,600 on line 18 as a ***capital gain*** not recurring salary or wage income that DES calculates and applies to eligibility requirements." (Doc. 86 at 6 (emphasis in original).) From this, Plaintiffs argue that "Watt's conclusion about 'intentional unreported income' to DES was wrong." (*Id.* at 7.) They go on to claim that "Watt made arrests of the Burton's based on tax returns he knows nothing about and as a result Watt did not proceed as a prudent person and with reasonable caution because the non-recurring capital gain is given complex tax treatment that DES does not factor into its eligibility assessments and DES never pursued a complaint and never saw fit to conduct an investigation." (*Id.* at 7.)

These belated arguments do not change the Court's determination that Defendant Watt had reasonably trustworthy information of facts and circumstances at the time of Plaintiffs' arrests from which a reasonable officer could infer that Plaintiff Carly knowingly obtained food stamps from DES by falsely underreporting the family's 2014 income. Plaintiffs have not produced any evidence to support their assertions that DES does not consider non-recurring income, such as capital gains, when assessing an applicant's food stamp eligibility. Moreover, "probable cause must be evaluated from the perspective of 'prudent men, not legal technicians,'" *Gasho*, 39 F.3d at 1428; *see also Florida v. Harris*, 568 U.S. 237, 244 (2013) ("All we have required is the kind of "fair probability" on which "reasonable and prudent [people,] not legal technicians, act") (internal citation omitted). A reasonable and prudent person looking at the $50,000 disparity between Plaintiffs' taxable income on their 2014 tax return and what Plaintiff Carly reported as family income to DES could have inferred there was a "fair probability" Plaintiff Carly's income report to DES was materially false and that a crime had been committed under Arizona Revised Statutes § 13-3701(A). *Bishop*, 264 F.3d at 924; *see also Martin*, 509 F.2d at 1213 (when assessing probable cause, courts must consider "all the reasonable inferences" that could be drawn from the facts and circumstances known to

the arresting officer at the time).  This remains the case even if the charges were later dropped or Plaintiff Carly was subsequently exonerated of that crime.  *See Beauregard*, 362 F.2d at 903.

The Court will grant summary judgment to Defendant Watt on Plaintiff's Fourth Amendment false arrest claims in Count I.

## 2.    Count VIII: Unreasonable Search and Seizure

Plaintiffs allege that Defendant Watt violated their Fourth Amendment rights to be free of unreasonable searches and seizure when he "entered the premises of Plaintiffs and seized property of the Plaintiffs without legally being able to do so."  (Doc. 11 ¶ 112.) Elsewhere in the FAC, Plaintiffs allege that Defendant Watt "removed personal property from Plaintiffs' home, including business records and files needed for tax purposes," as well as "personal diaries and journals, cell phones, computers, laptops, books, cash, and other property that belongs to Plaintiffs."  (*Id.* ¶¶ 36, 38.)

The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and decrees that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  Probable cause to obtain a search warrant exists "if 'there is a fair probability that contraband or evidence of a crime will be found in a particular place,' based on the totality of circumstances." *Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).

Defendants argue, and there is no material dispute, that the search and seizures at issue here were conducted pursuant to a valid search warrant.  (Doc. 72 at 7; DSOF ¶¶ 34−35; Doc. 79 at 3.)  Plaintiffs do not allege otherwise; nor do they allege or cite to any facts showing that the warrant was not based on probable cause or that the search and seizures exceeded the scope authorized therein.  Absent any such allegations or facts or supporting evidence, Plaintiffs cannot demonstrate that the search and seizures at issue here were unreasonable, and Plaintiffs' unlawful search and seizure claim fails as a matter of

law. *See Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (searches and seizures pursuant to a valid search warrant are "permissible invasions of the home and its curtilage"). The Court will grant summary judgment to Defendants on Plaintiffs' unlawful search and seizure claim in Count VIII.

### 3.    Count IX: Fifth Amendment

Plaintiffs allege that Defendant Watt violated their Fifth Amendment rights by not reading them their *Miranda* rights until several hours after their arrests, and then, "only after several hours of intimidation, threats, and interrogation." (Doc. 11 ¶ 115.) Plaintiffs also allege that they were denied the right to call their attorney and were not given a phone book or jail phone until "several hours after the arrest." (*Id.* ¶ 22.)

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The right also applies to the use of out-of-court statements obtained by compulsion. *Vega v. Tekoh*, 597 U.S. 134, 141 (2022). In *Miranda*, the Supreme Court set forth procedural safeguards it concluded were necessary to prevent compelled testimony. *Id.*; *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Thus, it required warnings be given prior to any custodial interrogations, and it further held that incriminating statements obtained without adequate procedural safeguards could not be used against a suspect in a criminal prosecution. 384 U.S. at 444. A violation of *Miranda*, however, "is not itself a violation of the Fifth Amendment," and it does not "confer a right to sue under § 1983." *Vega*, 597 U.S. at 152. Instead, *Miranda*'s procedural safeguards are to ensure "that the [Fifth Amendment] right against compulsory self-incrimination [i]s protected." *Michigan v. Tucker*, 417 U.S. 433, 444 (1974). To maintain a § 1983 claim based on the violation of the Fifth Amendment, an incriminating statement must be used against the plaintiff in a criminal prosecution. *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) ("mere coercion does not violate the text of the [Fifth Amendment] Self–Incrimination Clause absent use of the compelled statements in a criminal case against the witness").

Defendants argue that Plaintiffs' Fifth Amendment claims fail as a matter of law

because there are no allegations that any pre-*Miranda* statements Plaintiffs made were used against them in any criminal proceeding. (Doc. 72 at 7.)

### a.    Plaintiff Brig

In their Response, Plaintiffs argue that "DPS interrogated Plaintiff Brig before they read him his *Miranda* Rights and only when Plaintiff Brig refused to answer questions did DPS read him his *Miranda* rights. (Doc. 79 at 4.) Plaintiffs do not cite to any evidence to support these assertions, but even if properly supported, these bare facts do not give rise to a Fifth Amendment claim. Plaintiffs do not allege or point to any evidence to support that Plaintiff Brig made any coerced, self-incriminating statements or that any such statements were used against him in his criminal prosecution. Absent these required showings, Plaintiff Brig's Fifth Amendment claim fails as a matter of law, and the Court will grant summary judgment to Defendants on this claim.

### b.    Plaintiff Carly

Plaintiffs argue—again, without directing the Court to any evidence—that "DPS also violated Plaintiff Carly's *Miranda* Rights, as she exercised her *Miranda* Rights and opted not to speak with DPS but then a DPS officer proceeded to threaten, intimidate, and coerce Plaintiff Carly into reversing course and agree[ing] to speak with DPS interrogators." (*Id.*)[10] They also argue that "[e]ven though Plaintiff Carly was not

---

[10] Separately, in their Statement of Facts, Plaintiffs cite to Plaintiff Carly's deposition testimony to support that Plaintiff Carly "was not timely given the *Miranda* warnings after her arrest." (PASOF ¶ 37.) The operative question for Fifth Amendment purposes, however, is not whether an arrestee receives *Miranda* warnings immediately upon arrest but whether she receives them prior to being interrogated in police custody. *Michigan*, 417 U.S. at 444. Based on her proffered deposition testimony, after being taken to the police station, Plaintiff Carly was brought to a questioning room, where she met with Defendant Watt, but she "didn't want to talk to him at that time," and she requested an attorney. (Doc. 79-14 at 3 (Pl. Carly Dep. at 55:16−20).) She was then brought to a cell, where unidentified DPS officers questioned her and threatened her with going to jail and losing her children. (Pl. Carly Dep. at 55:21−56:15.) Plaintiff Carly also stated she first received *Miranda* warnings when she was in the "questioning room" with "Detective Watt," suggesting that this had already taken place. (*Id.* at 58:18−59:1.) Taken together, the cited testimony fails to establish who questioned and threatened Plaintiff Carly, and it

ultimately indicted, DPS then used Carly's statements as leverage against Plaintiff Brig to get him to agree to a plea deal on a lesser included charge of criminal possession of a forgery device." (*Id.*) They cite to a portion of Plaintiff Brig's plea agreement, which Defendants produced, showing the State agreed not to press charges against Plaintiff Carly as a condition of Plaintiff Brig's guilty plea. (*Id.*; Doc. 73-4 at 3−4 ¶ 3.) Plaintiffs argue that this shows the State used Plaintiff Carly's allegedly coerced statements as leverage to obtain Plaintiff Brig's conviction, so the requirement that the self-incriminating statements be used in a criminal prosecution is met. (Doc. 79 at 4.) Plaintiffs also assert that, regardless of whether they have a viable claim for damages under § 1983, they have "a viable claim for the violation of *Miranda* Rights." (*Id.*)

To the extent Plaintiffs argue that Plaintiff Brig can bring a Fifth Amendment claim based on the prosecution's purported use of Plaintiff Carly's statements to induce Plaintiff Brig's guilty plea, this argument fails. Defendants argue that "Plaintiff Brig points to no authority that says one defendant's alleged coerced statements can be raised as a violation of another's right against self-incrimination." (Doc. 82 at 2.) Indeed, such a proposition would be at odds with the Fifth Amendment, which protects an individual from being compelled to testify against himself, not from *someone else* being compelled to testify against *herself* (which is then asserted by another person).

The Court is also not persuaded Plaintiff Carly can maintain a claim for damages based on any self-incriminating statements she was allegedly compelled to make that were used in *someone else's* criminal prosecution, in this case to induce Plaintiff Brig's plea agreement. But even if the Court were to recognize a Fifth Amendment claim under these circumstances, Plaintiffs fail to identify any such statements or show beyond the conclusory argument of counsel in Plaintiffs' Response how any such statements were used to purportedly provide the prosecution leverage to obtain Plaintiff Brig's guilty plea.

---

appears this took place only after Defendant Watt issued *Miranda* warnings. Absent additional facts, this testimony does not show that Defendant Watt failed to give Plaintiff Carly timely *Miranda* warnings or that he compelled her to make self-incriminating statements in violation of her Fifth Amendment right against self-incrimination.

1    In addition to these deficiencies, Plaintiffs cannot show on the current record that

2    Defendant Watt was personally involved in any alleged violations.  *See Rizzo v. Goode*,

3    423 U.S. 362, 371−72, 377 (1976) (to prevail on a §1983 claim, a plaintiff must be able to

4    show she suffered a specific injury because of the conduct of a particular defendant and

5    must affirmatively link the injury to the conduct of that defendant).  The only evidence

6    Plaintiffs' present of Plaintiff Carly's alleged in-custody questioning shows that Defendant

7    Watt issued *Miranda* warnings when he met with Plaintiff Carly in the police station

8    questioning room, and Plaintiff Carly declined to talk.  There is no evidence Defendant

9    Watt coerced her to talk at that time or was involved in her subsequent interrogation.  For

10   this additional reason, Plaintiff Carly's Fifth Amendment claim against Defendant Watt

11   fails as a matter of law.

12    Any purported "*Miranda* claim" Plaintiffs claim to have against Defendant Watt

13   also fails for the same reasons already discussed and because, as explained above, *Miranda*

14   does not confer any rights of its own accord but is only a procedural safeguard to ensure

15   against Fifth Amendment violations.  *Vega*, 597 U.S. at 152.  The Court will grant summary

16   judgment to Defendants on Plaintiffs' Fifth Amendment claims against Defendant Watt

17   based on Watt's purported *Miranda* violations in Count IX.

18    **B.    State Law Torts**

19        **1.    Count V−VII: Defamation, Libel, False Light**

20    In Counts V, VI, and VII, Plaintiffs sue the State for defamation, libel, and false

21   light, respectively, based on unidentified DPS employees' posting of the June 24, 2019

22   press release about Plaintiffs' arrests ("the Post") to the DPS website.  Plaintiffs allege that

23   the Post contained "false and defamatory statements about the Plaintiffs."  (Doc. 11 ¶ 34.)

24   And they allege that, because of these statements, Plaintiff Carly lost her career with the

25   Arizona Department of Child Safety; Plaintiff Brig lost business opportunities, loans, and

26   investment capital; and Plaintiffs were collectively deprived of their good names and

27   reputations.  (*Id.* ¶¶ 35, 44−47.)

28    Under Arizona law, defamation is an umbrella term that encompasses both libel and

slander, with libel involving written or visual defamation, while slander is oral. *Boswell v. Phoenix Newspapers, Inc.*, 730 P.2d 178, 183 n.4 (Ariz. Ct. App. 1985) (supplemented by P.2d 186 (1986)). For defamation involving a private person, Arizona follows the Restatement (Second) of Torts § 580B, which requires a plaintiff to show (1) the defendant published a false and defamatory statement, and (2) the defendant either (a) knew the statement to be false and defamatory, (b) acted in reckless disregard to these matters, or (c) acted negligently in failing to ascertain them. *Peagler v. Phoenix Newspapers, Inc.*, 560 P.2d 1216, 1222 (Ariz. 1977). Similarly, to prevail on a claim for false light, "a plaintiff must show (1) the defendant, with knowledge of falsity or reckless disregard for the truth, gave publicity to information placing the plaintiff in a false light, and (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person in the plaintiff's position." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 450 (Ariz. Ct. App. 2015).

"[I]f an allegedly defamatory statement is substantially true, it provides an absolute defense to an action for defamation." *Fendler v. Phoenix Newspapers Inc.*, 636 P.2d 1257, 1261 (Ariz. Ct. App. 1981). Additionally, "[s]light inaccuracies will not prevent a statement from being true in substance, as long as the 'gist' or 'sting' of the publication is justified." *Sign Here Petitions LLC v. Chavez*, 402 P.3d 457, 465–66 (Ariz. App. 2017) (quoting *Read v. Phoenix Newspapers, Inc.*, 819 P.2d 939, 941 (Ariz. 1991)). Similarly, for false light claims, "the publication must contain 'a major misrepresentation of [the plaintiff's] character, history, activity, or beliefs,' not just slight inaccuracies." *Canas v. Bay Ent., LLC*, 498 P.3d 1082, 1087 (Ariz. App. 2021). When assessing for defamation, the Court must consider the totality of the circumstances and take the average reader's viewpoint. *Phoenix Newspapers, Inc. v. Church*, 447 P.2d 840, 845 (1968). Accordingly, publications are not to be evaluated by the "critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." *Yetman v. Eng.*, 811 P.2d 323, 329 (1991) (internal alterations, and citations omitted).

The Post is titled, "Chandler Couple Facing Numerous Charges after Defrauding

Several Victims and the State of Arizona."  (Doc. 73-4 at 20.)

Under this title, the Post states, "AZDPS detectives arrest Kent and Carly Burton in Chandler after an extensive investigation revealed recurring criminal business practices. (*Id.*)  The body of the Post states,

> Chandler, Arizona — On Thursday, May 16, 2019, Arizona Department of Public Safety (AZDPS) detectives arrested and booked 42-year-old Kent Burton and his wife, 36-year-old Carly Burton on charges of:
>
> - Aggravated taking the identity of another or entity
> - Forgery
> - Fraudulent schemes and artifices
> - Fraudulent schemes and practices/willful concealment
> - Perjury by inconsistent statements
> - Theft
> - Unlawful use of food stamps
>
> Throughout the investigation, detectives discovered Kent and Carly Burton falsified the victims' financial records.  During multi-million-dollar business transactions, the Burtons obtained goods and services in the names of the victims and defrauded victims out of more than $100,000.
>
> Additionally, the Burtons defrauded the Arizona Department of Economic Security by falsifying revenue records and unlawfully collecting more than $20,000 in Supplemental Nutrition Assistance Program (SNAP) benefits (food stamps). During this time, the Burtons were also attempting to acquire a 2.2 million-dollar business.
>
> Kent and Carly Burton were booked into the Maricopa County Sheriff's Office 4th Avenue Jail.

(*Id.*)

Defendants argue that Plaintiffs' libel[11] and false light claims fail as a matter of law

---

[11] Because libel is a form of defamation, Plaintiffs' libel and defamation claims are duplicative, and since Plaintiffs' claim involves written statements, the Court will use the more specific term libel when discussing this claim.  Also, because libel and false light are closely related, and both require a showing of falsehoods or misrepresentations, the Court will discuss these claims together.

because the above statements are "substantially true." (Doc. 72 at 9−12, 15−16.) They also argue that, to prevail on these claims, Plaintiffs must be able to show "actual malice," and they argue Plaintiffs cannot make this showing. (*Id.* at 8−9.)[12]

Plaintiffs argue that the Post is substantially false, not substantially true. (Doc. 79 at 6.) They make several objections to its content, which the Court will address in turn.

First, Plaintiffs note that the Post says nothing about the no probable cause finding at Plaintiffs' initial appearance, and they argue that "the omission of this crucial and exculpatory fact was malicious to create a false impression Plaintiffs were criminals notwithstanding the fact a judge found there was no probable cause to support keeping either Plaintiff Brig or Plaintiff Carly in custody after their arrests." (Doc. 79 at 7.)

Plaintiffs do not cite to any authority for the proposition that, to be substantially true, a publication of an arrest must include all known exculpatory facts. The Court is also not persuaded that the omission of the commissioner's no probable cause finding makes the facts of Plaintiffs' arrests and charges in the Post untrue or casts Plaintiffs' documented

---

[12] The Court is not persuaded that a showing of actual malice is required. Defendants rely on *Boswell*, 730 P.2d at 196, for the proposition that a defamation plaintiff must show actual malice if the challenged statements involve matters of public interest, which they argue applies here. (Doc. 72 at 8.) But *Boswell* only stated that a showing of actual malice is required for punitive damages, not that a plaintiff must show actual malice to prevail on the merits of his/her underlying claim. *See Boswell*, 730 P.2d at 196 (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749 (1985) ("If the defamation involves 'a matter of public concern,' a jury may not award presumed or punitive damages absent a showing of 'actual malice.'")). The Court is also not persuaded, as Defendants also argue, that a showing of actual malice is required because the statements in the Post are protected by "the common interest qualified privilege." (*See* Doc. 72 at 9.) The common interest qualified privilege applies to communications between associates in a common enterprise on the premise that "one is entitled to learn from his associates what is being done in a matter in which he has an interest in common with them." *See Green Acres Tr. v. London*, 688 P.2d 617, 625 (1984) (citing Restatement (Second) of Torts § 596, Comment c). Defendants broadly argue that the public has an interest in knowing when someone in the community is involved in fraudulent schemes, but they do not explain how the statements in the Post qualify as communications between associates with a common interest, and they fail to cite any authority showing this privilege applies to a police press release.

1   actions at that time in a false light.  As discussed, it is not clear on the record what facts

2   were presented at the initial appearance hearing, and while Commissioner Carson's no

3   probable cause finding necessitated Plaintiffs' release from custody, it did not change any

4   of the underlying facts in Defendant Watt's investigation or mean that Plaintiffs were not,

5   in fact, arrested and charged with the stated crimes.  Additionally, the overall context and

6   purpose of the Post was to notify the press and public of DPS's law enforcement actions,

7   not to present a criminal case for trial.  In this context, the omission of any facts about

8   Plaintiffs' initial appearance, including the no probable cause finding, does not make the

9   facts of their arrests and charges false or place Plaintiffs' character, history, activity, or

10  beliefs in a false light.

11      Plaintiffs next argue that the Post's use of the word "victims" in the title, which

12  states, "the Chandler couple" defrauded "several victims and the State of Arizona," makes

13  the statement untrue because, "if there was a jury verdict against Plaintiff Brig for fraud in

14  a civil trial, that does not make the prevailing party a victim, which is a term used for a

15  person who is harmed by a crime."  (Doc. 79 at 7.)  Plaintiffs also argue that the Post title

16  falsely conveys that both Plaintiffs participated in all the offenses charged, even though

17  Plaintiff Carly was only charged with defrauding the State, not any other crimes, and there

18  is no evidence Plaintiff Brig participated in defrauding the State.  (*Id.*)

19      Plaintiffs' suggestion that, because Plaintiff Brig had only previously been found

20  liable for fraud in civil court, not guilty of a crime, it is inaccurate to call those he defrauded

21  "victims" is nonsensical.  Both the commonly understood meaning of the word "victim,"

22  and the legal use of this term applies to individuals harmed by another's unlawful actions,

23  regardless of whether the offenses sound in civil or criminal law.  Moreover, the evidence

24  Defendant Watt included in his investigation is sufficient to show Plaintiffs' conduct

25  violated Arizona criminal law.  Just because Plaintiff Brig was also sued in civil court for

26  the same offenses does not mean his actions were not crimes.

27      Plaintiffs' reading of the Post title as falsely stating that both Plaintiffs were charged

28  with all the crimes listed is likewise needlessly strained.  The Post does not purport to

allocate which individual was charged with which crime, and the average reader would understand this list as encompassing all the charges against both Burtons. The fact that the Post lists all the crimes with which both Plaintiffs were collectively charged does not equate to a false statement or cast the known facts about Plaintiffs in a false light.

In a similar vein, Plaintiffs argue that the Post's statement that Plaintiffs were arrested "after an extensive investigation revealed recurring criminal business practices" is false because "[e]ach business practice Plaintiff Brig was involved in had its own unique circumstances and there is no 'recurring criminal business practice' that can be found in the transactions." (Doc. 79 at 7−8.) Plaintiffs' apparent interpretation of this phrase to falsely imply that Plaintiff Brig adopted a specific set of criminal business practice, each of which he repeated multiple times, is simply not demanded by the text. The evidence contained in Defendant Watt's report showed that Plaintiff Brig engaged in multiple criminal business practices involving several victims, each with the common thread of making false statements to sellers or purchasers of businesses to make money at their expense. Referring to these as "recurring criminal business practices" is not an inaccurate description, nor is it a "major misrepresentation" of Plaintiff Brig's history, activity, or character based on the facts uncovered in DPS' criminal investigation.

Plaintiffs next argue that the statement that "[t]hroughout the investigation, detectives discovered Kent and Carly Burton falsified the victims' financial records" is "blatantly false" because there is no evidence Plaintiffs falsified any "victims'" financial records. (Doc. 79 at 8.) They argue that "Defendants have not even identified, let alone substantiated with evidence, how Plaintiff Brig or Plaintiff Carly could obtain the financial records of a 'victim' to 'falsify' them," and they have not "provided a scintilla of evidence that Plaintiff Brig or Plaintiff Carly 'falsified' the financial records of any 'victim' (third party)." (*Id.*)

Defendants implicitly concede that Plaintiffs did not personally obtain and alter the accounting records of their victims, but they argue that the essence of the statement that they "falsified the victims' financial records" is substantially true. (Doc. 82 at 6.)

Defendants point to multiple examples wherein Plaintiffs' documented fraudulent actions resulted in the creation of false financial records for their victims. (*Id.*) They argue that, by cashing four checks payable to Kebko Signs that belonged to its previous owner Mr. Erdman, Plaintiff Brig created a false record that the checks were cashed with Mr. Erdman's permission; similarly, by making an unauthorized purchase on Mr. Erdman's credit card, Plaintiff Brigg created a false record that the transaction was authorized. (*Id*; DSOF ¶ 12−13.) Defendants also argue that, by inserting false representations into the purchase agreement for Kebko Signs Plaintiff Brig executed with the Gatzemeiers, including that the prior note for the company was current and that Kebko Signs had $100,000 in back order contracts, Plaintiff Brig created false representations in the business records of his victims. (*Id.* at 6−7.) Additionally, Defendants argue that Plaintiff Brig's false representation of the nature of Agricann in the Desert Schools business account application and Plaintiff Carly's false representation to DES about the couple's income in the DES food stamps application also created false financial records for those entities. (*Id.* at 7.) Defendants argue that these examples belie Plaintiff's claim that the Post statement is false, arguing "[t]here is no requirement that Plaintiffs made accounting entries in victim records to create a falsified record." (*Id.* at 6, 8.)

Looked at in context, the statement that Plaintiffs "falsified the victims' financial records" appears in one of two short explanatory paragraphs following the announcement of Plaintiffs' arrests and criminal charges. Like the introductory statement under the Post's title stating Plaintiffs were involved in "recurring criminal business practices," the statement is broad; it does not purport to identify specific financial records or falsifications. Considering the totality of the circumstances, the overall "gist" and "sting" of this statement is substantially true and would not place Plaintiffs' documented conduct in a false light. Moreover, even applying the strict, literal meaning of the phrase "victim's financial records," as Plaintiffs are wont to do, the statement is substantially true. Among other things, the evidence available to DPS at the time showed that, during his sale of Kebko Signs to the Gatzemeiers, Plaintiff Brig made several false representations about

the company's financial status, including by furnishing a list of back-orders that Mrs. Gatzemeier used to contact clients, only to discover that many of the purported "contracts" were no longer active or were only bids.  Even after Plaintiff Brig's sale of the company, then, the false information Plaintiff Brig provided became an essential and materially false part of the Gatzemeiers' financial records for Kebko Signs, showing the company had active contracts it did not have, and falsely inflating its value and profitability by a significant amount.  More directly, the evidence available to DPS showed Plaintiffs personally completed and submitted falsified applications to Desert Schools and DES that those entities also relied on and made part of their records.  On this record, the statement that Plaintiffs "falsified the victims' financial records," even if unartfully worded, is not "blatantly false," as Plaintiffs claim, and it is not a "major misrepresentation" of Plaintiffs' actions such that it would give rise to either a libel or false light claim.

Plaintiffs next argue that the statement, "During multi-million-dollar business transactions, the Burtons obtained goods and services in the names of the victims and defrauded victims out of more than $100,000" is false because the investigation only involved one multi-million dollar business transaction, not transactions, plural; Plaintiffs did not obtain goods and services in the names of the victims; and the losses that Defendants claim in their Motion amounted to more than $100,000 resulted from three separate transactions, none of which was, itself, a multi-million dollar transaction. (Doc. 79 at 9−10.)

As above, Plaintiffs merely parse out individual words and phrases and apply them with exacting precision to each transaction in isolation to argue the statements are false. The Post, however,  does not claim to identify each fraudulent activity or to give a detailed accounting of each business transaction or misuse of funds.  Instead, it makes only generalized, explanatory statements that summarize the bases of the various charges against Plaintiffs.  When considered as a whole, the evidence shows that Plaintiff Brig was involved in at least three business purchases or sales amounting to approximately $350,000, and he was attempting to purchase a $2.2 million business, collectively

amounting to roughly $2.5 million in business transactions. (DSOF ¶¶ 8, 17, 20, 32.)[13] The evidence also shows that Plaintiff Brig used Kevin Erdman's lines of credit and credit card, wherein he received goods and services in Erdman's name—including more than $17,500 from Wells Fargo, $13,000 from Johnson Plastics, and $2,200 from McGraw-Hill Dodge— each of which Plaintiff Brig failed to pay, leaving Mr. Erdman with the debts. (*Id.* ¶¶ 8−13). Additionally, civil court records show Mr. Erdman and Mr. Lechner were awarded approximately $40,000 and $55,000 in compensatory damages against Plaintiff Brig or his company, while the Gatzemeiers, who settled out of court, claimed over $45,000 in damages. (*Id.* ¶¶ 17, 19, 24). In this context, the general statement that "[d]uring multi-million-dollar business transactions, the Burtons obtained goods and services in the names of the victims and defrauded victims out of more than $100,000" is substantially true and does not give rise to a defamation or false light claim.

Finally, Plaintiffs argue that the statement in the Post that Plaintiffs defrauded DES is false because Plaintiff Carly was never indicted on this charge, "so there has never been a finding in any court of law that she defrauded DES." (Doc. 79 at 10.) They further argue that, even though Plaintiff Carly provided different income information to DES than Plaintiffs provided to the IRS, "there is absolutely no evidence she did so with the intent to defraud or had some other nefarious motive that could result in civil or criminal liability

---

[13] Additionally, on his Crowdfund.com webpage for Agricann, a copy of which Defendant Watt included in his General Report, Plaintiff Brig identified himself as the founder and managing partner of the "365 Group," which he described as a private equity, finance, and strategic consulting group that makes investments on the West Coast of the United States, including acquisitions of "small cap companies doing between $1MM−$20mm in sales." (Doc. 73-2 at 14.) He also identified himself as the founder and president of "Rockline Equity," which he similarly described as buying profitable and growing companies and seeking investments and acquisitions of companies in the Southwestern United States with $3 million in sales. (*Id.* at 14−15.) Although it is not clear from the evidence when Plaintiff Brig created this webpage, he dated his 365 Group work experience from "2008 − present" and his Rockline Equity work experience from "2016 − present," which encompasses the timeframe he bought and sold Kebko Signs, sold House Hunters, applied for a business account for Agricann, and the five years the family received SNAP benefits from DES.

for fraud." (*Id.*)  Plaintiffs make other, similar arguments that go to the merits of the charges against Plaintiff Carly, and they posit that, because the Post did not merely say DPS had probable cause to arrest her for fraud, but that she defrauded DES, it is substantially false.  (*Id.* at 10−11.)  They further argue that the statement is false as to Plaintiff Brig because "Defendants introduced no evidence that Plaintiff Brig defrauded DES." (*Id.* at 11.)

Plaintiffs' strained attempt to read the Post's statements as falsely announcing a final determination or conviction on fraud charges once again ignores the context of the statements therein.  Directly under its title, the Post accurately conveys that DPS detectives arrested Plaintiffs "after an extensive investigation revealed recurring criminal business practices." (Doc. 73-4 at 20.)  The Post also states that Plaintiffs were "arrested and booked . . . on *charges* of" the enumerated crimes.  (*Id.* (emphasis added).)  An average reader would know from its overall context that the Post was announcing only what the DPS investigation found, not a final judgment in a court of law.  Regardless of Plaintiff Carly's motives or intent or whether she was eventually charged with fraud, the Post accurately conveys what DPS detectives determined after extensive investigation to be true.

Finally, on the record before the Court, the Post's statement that the "Burtons," not just Plaintiff Carly, defrauded DES and collected more than $20,000 in food stamps is also substantially true.  Plaintiffs do not dispute that the food stamps were for the benefit of the Burton household, not just Plaintiff Carly, or that DES issued these benefits based on income representations that did not comport with the couples' reported income to the IRS or Plaintiff Brig's simultaneous attempt to purchase a $2.2 million business.  Plaintiffs have the ultimate burden of showing that the Post's statements, collectively identifying both Burtons in these actions, are false, and they have not directed the Court to anything on the current record that would make this showing.  Plaintiffs do not claim, for instance, that Plaintiff Brig did not know about or participate in the DES fraud, and they have not produced any evidence, such as an affidavit from Defendant Brig, that would show he was unaware of the large discrepancy between the couple's reported income to the IRS and

what Plaintiff Carly reported to DES or between his own high-dollar financial dealings and the couple's contemporaneous receipt of food stamps.

In summary, Defendants have shown that the statements in the Post were substantially true and did not substantially misrepresent the facts known to DPS about Plaintiffs' actions, and Plaintiffs fail to create a genuine issue of material fact that the statements were either not substantially true or that they placed Plaintiffs' character, history, activity, or beliefs in a false light. *Canas*, 498 P.3d at 1087. Because Plaintiffs cannot make these threshold showings, the Court need not address the other elements of their libel and false light claims. The Court will grant summary judgment to Defendants on Plaintiff's libel and false light claims in Counts VI, and VII and will dismiss as duplicative their defamation claim in Count V.

### 2. Count II: Intentional Infliction of Emotional Distress (IIED)

In Count II, Plaintiffs allege that Defendants' false arrest, false imprisonment, and "blatant lies" in the DPS Post after their arrests were "unconscionable and outrageous," and as a result, "Plaintiffs have been severely emotionally damaged, had their good name damaged, and have been embarrassed." (Doc. 11 ¶ 67.) Plaintiffs stipulated to the dismissal of Defendant Watt from this claim, so their only remaining IIED claim is against the State based on vicarious liability for the alleged actions of DPS employees.

To prevail on an IIED claim under Arizona law, a plaintiff must prove three elements: "[F]irst the conduct by the defendant must be "extreme" and "outrageous"; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct. *Citizen Publ'g Co. v. Miller*, 115 P.3d 107, 110 (2005) (en banc) (quoting *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (1987)); *see also Johnson v. McDonald*, 3 P.3d 1075, 1080 (Ariz. Ct. App. 1999).

To establish the first element, "the conduct alleged must be 'atrocious' and 'beyond all possible bounds of decency' so that an average member of the community would regard it as outrageous." *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.*, 716 P.2d 1013, 1015 (Ariz.

1986) (internal citations omitted).  Additionally, to establish the injury element, "[a] line of demarcation should be drawn between conduct likely to cause mere 'emotional distress' and that causing 'severe emotional distress.'" *Midas Muffler Shop v. Ellison*, 650 P.2d 496, 501 (Ariz. Ct. App. 1982) (citation omitted).  Crying, feeling transient emotional distress, and having occasional trouble sleeping are not severe emotional distress.  *Id.*  Potential qualifying examples of severe emotional distress include anxiety resulting in physical symptoms, such as high blood pressure, nervous tic, chest pains, fatigue, dizziness; and anger/depression coupled with physical ailments such as headaches and hemorrhoids. *Ford*, 734 P.2d at 583; *Pankratz v. Willis*, 744 P.2d 1182, 1186 (Ariz. App. 1987) ("nervousness . . . without any further showing of loss of earnings, physical damage, related use of medication, or 'being hampered in any respect from performing . . . daily functions' does not constitute severe distress") (quoting *Venerias v. Johnson*, 622 P.2d 55, 59 (Ariz. App. 1980) (citations omitted).

Defendants argue that Plaintiffs' IIED claim fails as a matter of law because Plaintiffs have not shown any conduct of Defendants that could be considered "beyond all possible bounds of decency, atrocious, or utterly intolerable in civilized society."  (Doc. 72 at 17.)  They also argue that Plaintiffs have not made any showing, and the record is devoid of any evidence, suggesting that they "suffered from anxiety, anger, or depression, which manifested in physical symptoms."  (*Id.*)  In their Response, Plaintiffs point to evidence that their expert concluded that "Plaintiffs have been deprived of property, their good name and have been emotionally and financially damaged" (Doc. 79 at 15; Doc. 79-6 at 6), but they concede that they "do not have independent evidence from a medical professional of physical ailments or symptoms arising from their emotional distress."  (Doc. 79 at 15.) Plaintiffs' also do not cite to affidavit testimony or any other evidence to make this showing.

The Court has already found that Plaintiffs' arrests were supported by probable cause and the statements in the Post were substantially true, so these actions do not establish conduct that is "atrocious," and "beyond all possible bounds of decency," such that, "an

average member of the community would regard it as outrageous." *Lucchesi*, 716 P.2d at 1015.  Plaintiffs do not argue otherwise or cite evidence of any other conduct from which to establish this showing.  Plaintiffs also concede that they have not produced evidence that they suffered physical ailments or symptoms arising from their emotional distress.  On this record, Plaintiffs cannot establish the requisite culpable conduct or that they suffered severe emotional distress, and their IIED claim in Count II fails as a matter of law.  The Court will grant summary judgment to Defendant on this claim.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 72).

(2)     Plaintiff's false arrest claim against Defendant Watt in Count III is **dismissed** as duplicative of the same claim against Defendant Watt in Count I, and their defamation claim in Count V is **dismissed** as duplicative of their libel claim in Count VI.

(3)     Defendants' Motion for Summary Judgment (Doc. 72) is **granted** as to all remaining Counts, and the action is terminated with prejudice; the Clerk of Court must **enter judgment** accordingly.

Dated this 30th day of June, 2025.

James A. Teilborg
Senior United States District Judge